[Cite as *Stocker v. Cochran's Decorative Curbing, Inc.*, 2010-Ohio-1542.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| KIMBERLY STOCKER, | ) | |
| | ) | CASE NO. 09 MA 128 |
| PLAINTIFF-APPELLANT, | ) | |
| | ) | |
| - VS - | ) | OPINION |
| | ) | |
| COCHRAN'S DECORATIVE CURBING | ) | |
| INC, et al., | ) | |
| | ) | |
| DEFENDANTS-APPELLEES. | ) | |

CHARACTER OF PROCEEDINGS:         Civil Appeal from Common Pleas
Court, Case No. 07 CV 1249.

JUDGMENT:         Affirmed.

APPEARANCES:
For Plaintiff-Appellant:         Attorney Matthew Giannini
1040 South Commons Place
Suite 200
Youngstown, OH 44514

For Defendants-Appellees:         Attorney Dominic Frank
Betras, Maruca, Kopp & Harshman
16233 St. Clair Avenue
East Liverpool, OH 43920

JUDGES:
Hon. Mary DeGenaro
Hon. Joseph J. Vukovich
Hon. Gene Donofrio

Dated: March 30, 2010

DeGenaro, J.

    **{¶1}** This timely appeal comes for consideration upon the record in the trial court

and the parties' briefs. Appellant, Kimberly Stocker appeals the July 23, 2009 decision of the Mahoning County Court of Common Pleas that dismissed Stocker's complaint and entered judgment in favor of Appellee, Cochran's Decorative Curbing, et al. (CDC) on their counterclaim for $4,343.00, subsequent to a bench trial before a magistrate. The trial court adopted the magistrate's decision, which found that CDC had performed their duties pursuant to the written contract between the parties, and that Stocker was required to render payment pursuant to the contract.

{¶2} On appeal, Stocker argues that the trial court's decision was against the manifest weight of the evidence because CDC did not complete their contractual duties within a reasonable amount of time and did not perform their texturized spray concrete application service in a workmanlike fashion. Stocker additionally argues that the magistrate erroneously refused to lift a prior discovery sanction and allow Stocker to present expert testimony at trial, after the magistrate caused a continuance of the bench trial.

{¶3} Upon review, Stocker's assignments of error are meritless. The trial court's finding of no unreasonable delay or unworkmanlike performance was not against the manifest weight of the evidence and the discovery sanction issue is not reviewable based on the record provided to this court. Accordingly, the trial court's decision is affirmed.

## Facts and Procedural History

{¶4} On April 9, 2007, Stocker filed a complaint against CDC, claiming breach of contract, breach of warranty and negligence. The complaint arose from a contract between the parties for the application of texturized concrete on an apartment building owned by Stocker. CDC filed a timely answer and counterclaim, alleging breach of contract, fraud, misrepresentation and unjust enrichment.

{¶5} The trial court scheduled a mediation between the parties for March 24, 2008. The mediation resulted in an impasse, and the case continued for trial. On July 17, 2008, Stocker filed a motion to continue the July 23, 2008 trial, stating that she would be out of state on a vacation. The trial court granted the motion and rescheduled the trial for January 14, 2009. For reasons not reflected in the docket, the trial did not take place in January.

**{¶6}** On February 2, 2009, Stocker filed a motion to permit plaintiff to submit expert discovery information, accompanied by a list of exhibits and expert witnesses. Stocker conceded that she had previously failed to comply with discovery requests and deadlines, and explained that her failure to make discovery efforts was due to an oversight and due to being away on vacation. Stocker argued that the additional time now afforded to the parties, due to the continuance of the trial to April 13, 2009, alleviated any potential prejudice to CDC by the belated discovery. The exhibits attached to Stocker's motion included a printout of high and low temperatures from November 1, 2006 to November 12, 2006, as well as an undated price quote from a company identified as "CVS" for the replacement of window screens and capping. The expert witnesses were identified as Lew Golden and Ray Van Dusen from CVS.

**{¶7}** On March 3, 2009, CDC filed a response to Stocker's motion, arguing that Stocker had not provided any legitimate reasons for her prior lack of compliance with discovery. CDC alleged that between Stocker's April 9, 2007 complaint and the trial previously scheduled for January 14, 2009, Stocker failed to respond to any of CDC's repeated requests for disclosure of witnesses and discovery materials. CDC alleged that all parties had appeared for the January 14, 2009 trial, and CDC objected to Stocker's untimely attempt to introduce exhibits and witnesses not previously disclosed. CDC alleged that the trial court concluded that Stocker would not be permitted to present evidence or witnesses other than that which she disclosed at the March 20, 2008 mediation hearing. CDC alleged that they had consented to the trial court's proposed continuance of the trial to April 13, 2009 based on the continued imposition of the discovery sanction against Stocker. Finally, CDC pointed out that Stocker's expert list only included the names of two window installers, and did not include any written report from the proposed expert witnesses as required by the Mahoning County Civil Local Rules of Court. On March 4, 2009, the trial court overruled Stocker's discovery motion.

**{¶8}** On April 13, 2009, a bench trial took place before the magistrate. Stocker attempted to present the testimony of Lew Golden of CVS. CDC objected on the grounds that the trial court had already prohibited the witness testimony in its March 4, 2009 ruling, and the trial court sustained CDC's objection. Stocker was, however, permitted to introduce the exhibit of daily temperatures included in her February 2 motion.

**{¶9}** Stocker testified that she was the owner of an apartment complex in Struthers, Ohio, and had solicited CDC's services for decorative concrete work on the apartment complex. Stocker testified that, before entering the contract, Stocker talked with CDC about what services she wanted, including smoothing out areas in the block work which were flawed or damaged, and giving the building a stucco-like appearance. Stocker signed the contract on May 18, 2006, and Tara Cochran signed the contract on June 1, 2006. Stocker submitted a faxed copy of the original estimate and proposed contract signed by Dean Cochran of CDC, and stated that the contract consisted of one page. The contract price was $8,685.00, with a requirement that half be paid before performance. The contract indicated that the concrete application would be performed by the end of August of 2006, but CDC did not perform the work until the beginning of November of 2006.

**{¶10}** Stocker called CDC repeatedly prior to November, asking them to complete the work soon before it got too cold. When the work was being completed, the temperatures were in the forties or fifties during the day, but below freezing with snow flurries at night. Prior to applying the concrete, CDC power washed the building and used a chemical to remove excess debris. CDC performed the concrete work over two days, and returned when Stocker complained that CDC had sprayed concrete on windows, capping, sidewalks and plants.

**{¶11}** Stocker submitted photographs that she had taken of her building shortly after CDC's work had been completed. Stocker testified that various photos showed that CDC had sprayed concrete on window screens and the capping around her windows and doors, that CDC had not repaired mortar or filled in cracks prior to applying the spray concrete, that the concrete was not applied evenly, and that color inconsistencies and white patches had appeared in the concrete. Stocker testified that the color inconsistencies occurred because CDC had applied the material when it was too cold. Stocker testified that CDC requested the remainder of the payment after the second day of applying the concrete, and Stocker refused. CDC returned to repaint areas of trim on the building affected by overspray. CDC also returned to apply additional concrete onto certain areas after Stocker's complaint. Stocker testified that the additional application of concrete was done poorly, leaving "big globs all over."

{¶12} On cross-examination, Stocker denied that she had lost her original copy of her contract with CDC, but stated that she had not brought the contract with her to trial. CDC presented their copy of the contract, which consisted of two pages. Stocker denied that there had been a second page on the contract that she had signed, though she agreed that the front page of CDC's copy was identical to the faxed copy that she had submitted. Stocker admitted that the contract did not state that CDC was to complete repairs to cracks or block work prior to applying the spray concrete, and did not include any "time is of the essence" term. Stocker explained that a delay in CDC's performance was not a problem, but timing the performance during cold weather was a problem. Stocker testified that CDC had informed her that the excessive rainfall over the summer necessitated a delay in their performance.

{¶13} Stocker testified that CDC did not put the concrete through a curing process, and did not apply a sealant coat after applying the concrete. Stocker conceded that the contract did not state anything about a sealant coat, but asserted that "it's just common sense." Stocker had recently painted the trim around her windows prior to CDC's work. Stocker testified that CDC failed to mask over the windows prior to applying the concrete, though she admitted that she was not present during the first day of application. Stocker stated that CDC's crew did not return to paint her trim, and that she personally did it with the help of Tara Cochran of CDC. Stocker testified that CDC did not return to power wash her window screens.

{¶14} Stocker testified that after she complained about the first application, CDC ordered additional materials and returned at the end of November to apply additional concrete. Stocker was still not satisfied with CDC's work after they had returned to do additional spraying as requested, and continued to refuse to render the second half of the payment.

{¶15} CDC offered the testimony of Ronald Dean Cochran. Cochran testified that he and his wife, Tara Cochran, are the owners of CDC. CDC has performed concrete work since 2001. Cochran has completed hundreds of spray coat concrete applications before, though Stocker's building, along with a project for Bliss Hall at Youngstown State University, were his first two instances of applying spray concrete onto vertical rather than

horizontal surfaces. Cochran could not recall if he completed the YSU job prior to Stocker's building.

{¶16} Cochran testified that before Stocker entered into a contract with CDC, Cochran brought sample boards of the product to show Stocker the thickness of the product. Cochran testified that Stocker's building had several different types of surfaces and textures: some brick, some flat, and some very concaved block. Cochran testified that he told Stocker prior to contracting that the spray concrete would not change the surface texture of the building, and that Stocker's main concern was not having to paint the building anymore.

{¶17} When asked about the contract between CDC and Stocker, Cochran noted that the installation date was set for the end of August. Cochran explained that the August date on the contract was chosen in May as a tentative installation date. Cochran noted that the back page of the contract indicates that the performance date can be changed at any time. Cochran testified that CDC will not do work on any day with more than a 40% chance of rain predicted. Cochran stated that 2006 was a very rainy year, causing him to delay many jobs that were ahead of Stocker's, which in turn delayed his performance on Stocker's building. Cochran talked with Stocker about pushing back the date of performance, and Stocker did not cancel the contract or state that performance needed to be completed immediately. Cochran testified that when he came to perform the work on Stocker's building in November, Stocker did not tell him to leave or complain about the cold weather and timing of the job.

{¶18} Cochran testified that he began work on Stocker's building in October, and that his final visit to Stocker's building was in December. In October, CDC first cleaned Stocker's building with a pressure washer to remove any loose paint or debris, then completes the stripping of debris with chemicals. CDC completed cleaning and stripping in one and a half weeks. Stocker sent pictures to CDC of the building prior to performance of the job. The pictures provided did not show foliage or plants on the ground around the building where CDC sprayed the concrete.

{¶19} Cochran testified as to the various chemicals and minerals that a company might mix into concrete to prevent freezing. Cochran stated that it was acceptable in his trade to perform concrete work at any time of the year. Cochran testified that the

temperatures in November of 2006 were rather mild, in the forties through sixties during the day and cooler at night. Cochran pointed out in a picture of the work during the beginning of December that one of his crewmembers was wearing shorts. Cochran did not add calcium or other materials to the concrete at issue to prevent freezing. Cochran testified that the outside surface of concrete dries relatively quickly, and that curing the concrete involves ensuring that the material hardens all the way through. Cochran testified that the spray concrete is one sixteenth of an inch thick and dries very quickly, and does not have the same freezing concerns as with laying a slab of concrete that is four to six inches thick.

{¶20} The trial court allowed one of Stocker's previously barred exhibits, and Cochran testified from the exhibit that the nighttime temperatures during the contract performance did reach freezing and that there was some snow. Cochran pointed out that the temperatures in the exhibit were taken from an airport in Vienna, Ohio, not in Struthers, and did not know if the airport was near Stocker's building. Cochran stated that such temperatures would not affect the application of spray concrete, especially because the concrete was applied during the day in fifty-degree weather, and dries quickly. Cochran testified that sprayed concrete at one-sixteenth of an inch thick would dry in two to three hours.

{¶21} Stocker testified that he received training on the spray concrete in 2001, that he attended approximately three additional training sessions afterwards, the most recent of which was in the spring of 2006. Cochran was certified by the manufacturer upon completing training. Cochran stated that, from his training and knowledge, the materials for spray concrete are not affected by the cold, except for extreme temperatures such as thirty degrees below zero. Cochran noted from his company's brochure about the product that the optimum cure time for the product is 24 hours, with a minimum amount of four hours. Cochran testified that he finished applying the concrete on Stocker's building at approximately three or four o'clock in the afternoon. When asked about his training on the spray concrete product, Cochran denied ever being told by the manufacturer that the product should not be applied at temperatures below fifty degrees.

{¶22} Cochran testified that CDC used shields to cover the windows of Stocker's building while they were spraying the concrete. Cochran conceded that some material

got on the window screens. Cochran informed Stocker that they would have to spray electrical wires and other items on the building, but did not specifically inform her that the spray would get on the gutters and downspouts. Cochran did not use tarps to cover the sidewalk or shrubs, though he stated that no spray concrete got onto the sidewalks, and that there were no plants around the building where they had sprayed.

**{¶23}** Cochran stated that he purchased part of the materials for Stocker's building on August 21, 2006. Cochran testified that he used some materials he already had in stock, and otherwise orders materials in advance and stores them so that they are immediately available when he is ready to begin a particular job. Cochran testified that when Stocker stated that she was dissatisfied and would not pay, Cochran asked what he needed to do in order to satisfy her, then ordered the extra materials and completed the extra work so that she would pay. Cochran ordered additional materials for Stocker's building on November 9, 2006, in order to remedy the issues that Stocker had with Cochran's performance. CDC performed a total of approximately two weeks of work on the project for Stocker's building.

**{¶24}** According to Cochran, Stocker stated that she would pay CDC if they used more material with a rougher texture, which CDC did when they returned to spray a second application. When CDC completed additional work in order to satisfy Stocker, they spent an additional $368.92 for materials, and additional money for shipping and for labor performed by employees. Cochran used additional coarse sand in his second application of the product in order to get the rougher texture that Stocker said she wanted. When Stocker complained about the overspray, Cochran removed every one of the window screens, power washed them, cleaned all of the cappings around the windows, and repainted even though he had advised Stocker not to paint them before the application of the concrete.

**{¶25}** Cochran came to Stocker's building and took pictures of the job during the spring of 2007. Cochran did not think that the color of the concrete had faded, and did not see any white film on the concrete.

**{¶26}** Stocker returned for rebuttal testimony, and stated that there were still particles of concrete in the window screens. Stocker conceded that her shrubs did not end up getting damaged by the overspray of concrete. Stocker testified that there is still

concrete on the stoop to the front apartment, and on the building's downspouts. Stocker testified that she did not take photographs of the screens or sidewalks as they exist now.

**{¶27}** Both parties submitted proposed findings of fact and conclusions of law, and on June 15, 2009, the magistrate issued his decision. The magistrate found that the contract stated that the work was to be performed at the end of August, and that the contract contained a term that CDC could change the installation date at any time The magistrate found that Stocker did not prove that CDC had performed its spray concrete application in an unworkmanlike fashion. The magistrate found that CDC performed work beyond the contractual obligation by applying additional concrete product to the building, power washing the windows, and painting all of the trim on the building. However, because the additional work was not set forth in the contract, CDC was not entitled to payment from Stocker for the additional work. The magistrate concluded that CDC was entitled to the remainder of the contract price, plus interest and costs, and dismissed Stocker's complaint.

**{¶28}** On June 29, 2009, Stocker filed objections to the magistrate's decision, specifically objecting to the magistrate's finding that Stocker's testimony regarding the unreasonable performance by CDC was merely "self-serving." Stocker objected to the finding that Stocker had failed to provide any proof of monetary damages outside of the contract price, arguing that she should have been permitted to supply the previously requested additional discovery. On July 23, 2009, the trial court filed a judgment entry, finding no error of law or fact in the magistrate's decision, adopting the decision of the magistrate, dismissing Stocker's complaint, and entering judgment on CDC's counterclaim for $4,343.00 plus interest and costs.

## Manifest Weight

**{¶29}** In the first of two assignments of error, Stocker asserts:

**{¶30}** "The decision of the trial court is against the manifest weight of the evidence."

**{¶31}** As a preliminary matter, CDC did not file an appellate brief. Accordingly, we may consider Stocker's statement of the facts and issues as correct and reverse the judgment if Stocker's brief reasonably appears to sustain such action. App.R. 18(C).

**{¶32}** Stocker argues that CDC's delayed performance constituted a breach of contract, and that CDC further breached the contract by applying the concrete in a careless and unworkmanlike fashion.

**{¶33}** To succeed in an action for breach of contract, a plaintiff must prove by a preponderance of the evidence that a contract existed, that the plaintiff fulfilled her obligations under the contract, that the defendant failed to fulfill his obligations under the contract and that damages resulted from his failure. *John Snyder, Inc. v. Cooper*, 7th Dist. No. 99 JE 45, 2001-Ohio-3215. The determination of whether a party has materially breached a contract is generally a question of fact. *Creative Concrete v. D&G Pools*, 7th Dist No. 07 MA 163, 2008-Ohio-3338, at ¶20, citing *Kersh v. Montgomery Developmental Ctr.* (1987), 35 Ohio App.3d 61, 63, 519 N.E.2d 665.

**{¶34}** A trial court's decision on a question of fact should be reversed only if it is against the manifest weight of the evidence. *Seasons Coal Co., Inc. v. Cleveland* (1984), 10 Ohio St.3d 77, 10 OBR 408, 461 N.E.2d 1273. Pursuant to a civil manifest weight of the evidence standard of review, a reviewing court should defer to the judgment of the trial court in factual determinations, and "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court." *Creative Concrete* at ¶17, quoting *C.E. Morris v. Foley Construction Co.* (1978) 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578. A reviewing court should make all reasonable presumptions in favor of the trial court's judgment and findings of fact. *Karches v. City of Cincinnati* (1988), 38 Ohio St.3d 12, 19, 526 N.E.2d 1350.

**{¶35}** Stocker contends that the manifest weight of the evidence indicated that CDC was at fault for untimely performance and poor workmanship. Stocker's arguments evoke two different areas of contract law: breach of contract for failure to perform within a reasonable time, and breach of the implied warranty of performance in a workmanlike manner.

**{¶36}** Regarding timeliness of performance, the contract between Stocker and CDC indicated that the time of performance was to be August of 2009, but an additional term of the contract noted that CDC could delay the date of performance at any time. Because the terms of the contract allowed for a possible indefinite time of performance, we generally presume that the contract was to be performed within a reasonable time.

*Rock v. Monarch Bldg. Co.* (1912), 87 Ohio St. 244, 252, 100 N.E. 887. An unreasonable delay in performance may constitute a material breach of the contract. See *Morton Bldgs., Inc. v. Correct Custom Drywall, Inc.*, 10th Dist. No. 06AP-851, 2007-Ohio-2788, at ¶16, citing 23 Williston, Contracts (4 Ed.2000) 487-488, Section 63:18. To determine whether a party has breached a contract through unreasonable delay, the trier of fact must consider the circumstances contemplated by the parties at the time the contract was executed, and the circumstances surrounding performance. *Catz Ent., Inc. v. Valdes*, 7th Dist. Nos. 07 MA 201, 07 MA 202, 08 MA 68, 2009-Ohio-4962, at ¶38.

{¶37} The parties entered into the contract at the end of May 2006, with an initial indication that CDC would perform services at the end of August of 2006. The contract indicated that CDC could change the date of performance at any time, and the contract did not contain any "time is of the essence" clause. According to Cochran's testimony, the excessive rain during 2006, especially the summer of 2006, caused his company to fall behind schedule. Cochran's testimony demonstrated that his business and the speed of his performance on any job was dependant on the weather, and rainy conditions could not be predicted at the time of contract formation for any particular job. For the job in question, CDC was able to perform three months later, in November of 2006. The foregoing presents some competent credible evidence to support the trial court's conclusion that CDC's delay in performance did not constitute a material breach.

{¶38} Moreover, Stocker did not provide any proof that she suffered damages as a result of a delay in CDC's performance, such as a postponement of her ability to house tenants, for example. Instead, Stocker conceded during her testimony that the timing, rather than the timeliness, was at issue. Because the timing of CDC's performance was during colder months, Stocker indicates that such timing contributed to the discoloration of the concrete and thus the poor quality of CDC's performance. Had CDC further delayed their performance and not installed the concrete until the warmer months of the following year, the evidence does not indicate that there would have been a problem. Thus Stocker's argument on this point falls less under an untimely performance argument, and more a factor in analyzing the warranty that a service will be performed in a workmanlike fashion.

{¶39} As for Stocker's second argument, the obligation to perform a service in a workmanlike fashion is an implied duty imposed by law. *John Snyder, Inc.*, supra, citing *Velotta v. Leo Petronzio Landscaping, Inc.* (1982), 69 Ohio St.2d 376, 378-379, 23 O.O.3d 346, 433 N.E.2d 147. In order to succeed on this kind of breach of warranty claim, a plaintiff must prove lack of ordinary care and skill, or negligence. *Velotta* at 378. An analysis of this claim requires the trial court to determine issues of fact as to whether the breaching party demonstrated workmanlike skill and judgment. *John Snyder, Inc.*, citing *Mitchem v. Johnson* (1966), 7 Ohio St.2d 66, 73, 36 O.O.2d 52, 218 N.E.2d 594. When a trial court's decision on this factual issue turns on an assessment of credibility, this court should not overturn the decision if there is any competent credible evidence supporting the trial court's decision. *C.E. Morris*, supra.

{¶40} Stocker largely failed to raise specific facts demonstrating that CDC breached any duty under law or contract. As for the alleged discoloration of the sprayed concrete, Stocker's photograph exhibits did indicate that there was some color variation in the concrete. However, the contract between the parties indicated "CDC is not responsible for slight color variations from the color charts. Concrete inherently cures at different rates and this affects the final coloring of the product." Stocker indicated that the air temperature fell to a certain level during CDC's performance, but provided no proof to support her claim that the application of concrete was inadvisable during such temperatures, or proof that lower temperatures caused the discoloration. Additionally, although Stocker's testimony indicated that the degree of discoloration was unreasonable, Cochran's testimony indicated otherwise, and the trial court found Cochran to be the more credible witness.

{¶41} As for the overspray, Stocker did not provide proof to support her assumption that the exercise of workmanlike skill and judgment would result in absolutely no overspray of the concrete product. Moreover, CDC indicated that they took remedial measures regarding the overspray, including cleaning and repainting, even after advising Stocker not to paint prior to the concrete work. Stocker's picture exhibits, dated November 27, 2006, reflect the state of her building prior to CDC's remedial efforts, and Stocker did not present any evidence of the condition or appearance of the building subsequent to CDC's final work. Stocker conceded during her testimony that the

overspray did not damage her landscaping. The parties disagreed as to whether any product landed on the sidewalks around Stocker's building, and the trial court presumably chose to believe Cochran's testimony.

**{¶42}** The magistrate's findings included the finding that Cochran advised Stocker not to paint the trim on her building prior to the application of the spray concrete, that Cochran was certified by the spray concrete manufacturer to apply the product, that Stocker's claims of unworkmanlike performance were unsupported, and that Cochran exceeded his contractual duties to remedy Stocker's possibly unsupported complaint of unworkmanlike performance. We are guided by the presumption that the trial court's factual findings are correct, and the testimony and exhibits provided constitute some competent credible evidence supporting the magistrate's findings and the trial court's decision. Accordingly, Stocker's first assignment of error is meritless.

### Discovery Violation

**{¶43}** In her second assignment of error, Stocker asserts:

**{¶44}** "The trial court erred when, having continued the trial for an extended period due to the unavailability of a courtroom, the magistrate denied plaintiff's contemporary request to allow expert testimony and evidence of damages on the new trial date, which it had previously denied because of her untimely response to defendant's discovery prior to the January trial date."

**{¶45}** Stocker contends that the court abused its discretion by refusing to lift a prior discovery sanction, barring Stocker from presenting expert witness testimony, after the trial court continued the trial for three months.

**{¶46}** Trial courts have broad discretion over discovery matters. *State ex rel. Citizens for Open, Responsive & Accountable Govt. v. Register*, 116 Ohio St.3d 88, 2007-Ohio-5542, 876 N.E.2d 913, at ¶18. A trial court's decision regarding a motion regarding untimely discovery, or a motion to extend the time for discovery, is reviewed for an abuse of discretion. See *Harvey v. Republic Servs. Of Ohio II, L.L.C.*, 5th Dist. No. 2007 CA 00278, 2009-Ohio-1343, at ¶83. Further, a trial court has the discretion to exclude the presentation of an expert witness by a party who failed to comply with pretrial orders. *Scibelli v. Pannunzio*, 7th Dist. No. 05 MA 150, 2006-Ohio-5652, at ¶36; *Kolidakis v. Glenn McClendon Trucking Co.*, 7th Dist. No. 03 MA 64, 2004-Ohio-3638, at ¶23; Civ.R.

26; Civ.R. 37. "[C]hoices involving discovery sanctions are upheld unless the result is 'so palpably and grossly violative of fact or logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but the defiance of judgment, not the exercise of reason but instead passion or bias.'" Scibelli at ¶35, quoting *Nakoff v. Fairview Gen. Hosp.*, 75 Ohio St.3d 254, 256, 1996-Ohio-159, 662 N.E.2d 1.

**{¶47}** The record on this particular issue is extremely limited. Stocker's argument on appeal, as well as her February 2, 2009 motion and CDC's March 3, 2009 response, all reference a discovery sanction placed on Stocker by the magistrate. However, the record before this court does not reflect when such a sanction occurred, the exact circumstances giving rise to the sanction, the reasons used by the magistrate to impose the sanction, or the extent of the sanction that the magistrate imposed on Stocker. This court could infer from the parties' references that the discovery sanction was imposed when the parties appeared before the magistrate with the intent to proceed to trial on January 14, 2009. However, there is no transcript submitted in the record of the parties' discussions with the magistrate on that date, and no statement or supplement was supplied regarding such discussions or events, pursuant to App.R. 9(C) or App.R. 9(E).

**{¶48}** It is the appellant's responsibility to demonstrate error on appeal, and the appellant must provide a record which exemplifies the claimed error. *State v. Kuhn*, 7th Dist. No. 02 BA 7, 2003-Ohio-4007, at ¶35, quoting *State v. Funkhouser,* 7th Dist. No. 02-BA-4, 2003-Ohio-697, a ¶13. See, also, App.R. 9(E); App.R. 10(A). Here Stocker argues that the trial court's decision not to lift its previous sanction was an abuse of discretion. However, with no information in the record regarding the original sanction, this court does not have adequate information to review whether the trial court's subsequent decision regarding the sanction was or was not an abuse of discretion. In the absence of a complete record on appeal, this court presumes the regularity of the proceedings below. *Kuhn* at ¶20. Accordingly, Stocker's second assignment of error is meritless.

**{¶49}** In conclusion, there existed some competent credible evidence supporting the trial court's conclusion that Stocker did not prove Cochran's unreasonable delay or unworkmanlike performance, thus the trial court's decision was not against the manifest weight of the evidence. Stocker's failure to provide this court with an adequate record to

review her second assignment of error waives review thereof.  Accordingly, the judgment of the trial court is affirmed.

Vukovich, P.J., concurs.

Donofrio, J., concurs in judgment only.